# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **Daniel's Heating & Cooling Co.**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**ROBERT BOSCH LLC, ROBERT BOSCH GMBH, JC RESIDENTIAL AND LIGHT COMMERCIAL LLC, JOHNSON CONTROLS HITACHI AIR CONDITIONING NORTH AMERICA LLC, TRANE TECHNOLOGIES PLC, TRANE U.S. INC., MITSUBISHI ELECTRIC TRANE HVAC US, CARRIER GLOBAL CORP., VIESSMANN MANUFACTURING CO. (U.S.), INC., DAIKIN INDUSTRIES, LTD., DAIKIN COMFORT TECHNOLOGIES NORTH AMERICA, DAIKIN APPLIED AMERICAS, THERMALNETICS, LLC, LENNOX INTERNATIONAL, INC., LENNOX INDUSTRIES INC., ALLIED AIR ENTERPRISES LLC, RHEEM MANUFACTURING CO., AAON, INC., a Nevada Corporation, AAON, INC., an Oklahoma Corporation, AAON COIL PRODUCTS, INC., and BASX, INC.,**<br><br>Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

1

**TABLE OF CONTENTS**

I.   NATURE OF THE ACTION ......................................................................1

II.  JURISDICTION AND VENUE ...............................................................7

III. PARTIES ..................................................................................................9

    A.   Plaintiff.............................................................................................9

    B.   Defendants........................................................................................9

        1.   The Daikin Defendants. .........................................................9

        2.   The Bosch Defendants. ........................................................11

        3.   The Trane Defendants. .........................................................13

        4.   The Carrier Defendants........................................................15

        5.   The Lennox Defendants........................................................16

        6.   The Rheem Defendants.........................................................18

        7.   The AAON Defendants.........................................................19

IV.  AGENTS AND CO-CONSPIRATORS....................................................20

V.   FACTUAL ALLEGATIONS ..................................................................22

    A.   Industry Background .......................................................................22

        1.   HVAC Equipment ................................................................22

            a.   Residential HVAC Equipment. ...................................23

            b.   Commercial HVAC Equipment....................................24

    B.   Market Distribution and Size .........................................................27

    C.   Pricing Basics in the HVAC Equipment Industry ..........................27

    D.   Overview of Defendant-Manufactured Products .............................29

    E.   The Air-Conditioning, Heating, and Refrigeration Institute...............31

    F.   Pre-2020: Stable Pricing Aligned with CPI and Household
        Appliance PPI..................................................................................36

    G.   Defendants' Conspiracy to Fix Prices of HVAC Equipment.............37

        1.   2020: COVID-19 Pandemic and the Phasedown of HFCs
            Under the AIM Act Create Cover for Coordinated Pricing .....37

i

2.      2021: Defendants Intensify Coordinated Pricing Practices .....40

3.      2022: The Conspiracy Gains Momentum ..............................45

4.      2023: The Conspiracy Reaches New Heights.........................47

5.      2024: The Conspiracy Became the Status Quo ......................50

6.      2025: Defendants Steadily Increase Prices by Embracing "Price Discipline" ...................................................................51

7.      2026: Conspiratorial Pricing Discipline Entrenched as Industry Norm ...................................................................55

H.      Defendants Elevated HVAC Equipment Prices Above Competitive Levels.........................................................................59

I.      "Plus Factors" Support the Plausibility of Defendants' Conspiracy ........................................................................................62

1.      There are no close substitutes for HVAC Equipment. .............63

2.      The demand for HVAC Equipment is inelastic. ......................64

3.      The HVAC Equipment industry is highly concentrated and consolidated. ..................................................................65

4.      The HVAC Equipment industry has high barriers to entry......67

5.      HVAC Equipment is largely commoditized. ...........................68

6.      Defendants took advantage of opportunities to collude. ..........70

        a.      The Air-Conditioning, Heating, and Refrigeration Institute...................................................................70

        b.      Other industry conferences. ............................................73

        c.      ACHR News. ..................................................................74

        d.      HARDI...........................................................................74

VI.     DEFENDANTS FRAUDULENTLY CONCEALED THE CONSPIRACY, AND PREVENTED ITS DISCOVERY ...........................75

VII.    CLASS ACTION ALLEGATIONS...............................................................80

VIII.   ANTITRUST INJURY ................................................................................84

IX.     CLAIMS FOR RELIEF ...............................................................................85

X.      PRAYER FOR RELIEF ...............................................................................87

XI.     JURY TRIAL DEMANDED ........................................................................89

ii

Plaintiff, Daniel's Heating & Cooling LLC, brings this civil antitrust action on behalf of itself individually and on behalf of a proposed Class of all persons and entities who directly purchased HVAC Equipment[1] manufactured by the Defendants in the United States beginning at least as early as January 1, 2020 through the present (the "Class Period").

## I.   NATURE OF THE ACTION

1.     Beginning in at least 2020, the largest manufacturers of HVAC Equipment sold in the United States quietly shifted from competing on price to moving in lockstep. What might otherwise appear as routine corporate messaging took on a different tone, when, in rapid succession, HVAC industry executives used public earnings calls to emphasize production cuts, "disciplined" pricing, and a shared commitment not to compete by lowering prices. These were not isolated remarks, but signals reassuring each other that no one would break ranks.

2.     The behaviors fueling this action can be aptly characterized by a series of recent communications from HVAC industry executives. In a January 29, 2026 public earnings call, Trane's CEO announced that it "reduced factory production days by one-third" in order "to normalize residential inventory," and stated, "I don't want anyone to think that pricing is coming down in that market." The next day, on

---

[1] In this Complaint, HVAC Equipment is defined as the appliances used in residential and commercial ducted heating, ventilation, and cooling systems.

January 30, 2026, Lennox's CEO committed to raise prices, saying "[b]ased on everything we have seen so far, we see our competitors aiming at similar price increases." A week later, on February 4, 2026, Daikin's President announced price increases, saying, "We are not increasing our market share by lowering our selling prices." The next day, on February 5, 2026, Carrier's CEO declared, "We have no intent of losing any share while maintaining price." Less than three weeks later, Lennox's CFO again recognized that "the industry's generally been disciplined for the past several years. . . . we're gonna continue to increase our pricing to maintain our margins. I think others have generally been as well. You know, we, as an industry, have realized that, you know, pricing, you know, taking it away, does not win market share."

3.      This is not how competitors speak. Rather, this is how conspirators use public earnings calls and other presentations to signal to one another their commitment to a common scheme to fix prices.

4.      Behind the scenes, through frequent and repeated members-only confidential meetings, information sharing, communications, and public signaling, Defendants drove the prices of HVAC Equipment to historic levels. Two key organizations served as conduits for coordinated exchanging information and telegraphing pricing strategies. First, Defendants used the Air-Conditioning, Heating, and Refrigeration Institute ("AHRI"), a trade association for the HVAC

2

industry they largely control, to implement extensive sharing of information available only to AHRI members who also agreed to share their own data with their competitors. Second, Defendants used a niche HVAC industry publication, Air Conditioning, Heating & Refrigeration ("ACHR") News, to each announce their price increases to and provide commentary on their pricing and supply plans.

5.      HVAC Equipment regulates indoor environments by providing thermal comfort, managing humidity, and improving air quality in residential and commercial buildings.   HVAC Equipment functions by heating, cooling, and circulating air, often using furnaces for heat, air conditioners for cooling, and ductwork to distribute air through a space.  Types of HVAC Equipment include air conditioner condensers, heat pumps, furnaces, air handlers, rooftop units, split systems, chillers, and variable refrigerant flow systems.

6.      HVAC Equipment is essential and expensive. For example, Defendant Carrier estimates that on average, heat pump installation costs and HVAC replacements for existing heat pumps cost range from $6,000 to $25,000. Defendant Trane estimates that, on average, the replacement cost of a priority air conditioner can range from $11,000 to over $13,000. These costs often require consumers and businesses to take out financing to afford HVAC Equipment. These prices, as detailed herein, have skyrocketed since the beginning of 2020—the year that Defendants' price fixing conspiracy began.

3

7. While the purchase of HVAC Equipment is necessary, consumers and businesses have no ability to resist rising prices. As one industry participant stated in July 2021 as prices skyrocketed, "I don't think there's been much pushback from the consumer at all. The consumer doesn't know what the -- what a price is. It's not a frequent purchase for the consumer."

8. In the United States, the manufacturing of HVAC Equipment is highly regulated by industry standards that have been in place for many years, leading to limited product differentiation. The technology and processes for manufacturing HVAC Equipment are well-established. Demand for HVAC Equipment is relatively stable due to their frequency of use in residential and commercial properties and the life cycle of HVAC Equipment, which require periodic maintenance and replacement.

9. As a result of its regulation and widespread desirability, HVAC Equipment, as standardized, mass-produced units, is a commodity. As producers of commodities, individual HVAC Equipment manufacturers should be irrelevant to the value of the HVAC Equipment itself, making HVAC producers "price takers" in markets based purely on supply and demand. In 2019, the year preceding Defendants' price fixing conspiracy the United States HVAC Market was valued at approximately $25.6 billion. However, over a period of five years this number

4

jumped all the way up to $31.26 billion and is expected to reach $38.45 billion in 2030.

10.     During the Class Period, Plaintiff alleges that Defendants conspired to fix, raise, maintain, and stabilize the price of HVAC Equipment in the United States. This alleged coordination had real-world consequences. Defendants' anticompetitive behaviors widened the spread between the price that they pay to manufacture HVAC Equipment and the price at which they sold HVAC Equipment to residential and commercial consumers.

11.     Since at least the beginning of 2020, Defendants have offered several pretextual explanations to obfuscate their price fixing conspiracy. Even as Defendants pointed to COVID-19 disruptions as justification, prices for   HVAC Equipment rose far beyond those pressures.  In fact, during the Class Period, the Air-Conditioning, Refrigeration, and Forced Air Heating Equipment Manufacturing Producer Price Index ("HVAC PPI") rose faster than both the Consumer Price Index ("CPI") and the Major Household Appliance Manufacturing PPI ("Household Appliance PPI") (as shown in Figure 1 below).

5

**Figure 1**



12.     Another excuse offered by Defendants was that the Department of Energy's update to the minimum energy efficiency standards for air-source heat pumps and residential central air conditioners through its new Seasonal Energy Efficiency Ratio 2 ("SEER2") test metric justified significant price increases. However, the new SEER2 energy conservation standards could not have come as any surprise to Defendants because they had, at a minimum, six years to develop compliant HVAC Equipment.

13.     Defendants also claimed the dramatic increases in the price of HVAC Equipment was actually caused by the phasedown of hydrofluorocarbons ("HFCs") mandated by the American Innovation and Manufacturing ("AIM") Act of 2020. But ironically, the HVAC Equipment industry itself championed domestic efforts to phase out HFCs, investing billions in the transition to next-generation technologies.

In fact, the HVAC Equipment industry began their advocacy over 20 years before the restrictions went into effect in 2025.

14. Plaintiff and members of the Class are individuals and entities who purchased HVAC Equipment directly from Defendants. Plaintiff brings this action on behalf of itself individually and on behalf of all persons and entities who purchased HVAC Equipment directly from a Defendant in the United States during the Class Period.

15. Defendants in this case are the leading manufacturers of HVAC Equipment in the United States: Trane, Carrier, Daikin, Bosch, Lennox, Rheem, and AAON. These seven Defendants control over 90% of the market for HVAC Equipment in the United States.

## II.   JURISDICTION AND VENUE

16. Plaintiff brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and members of the Class by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to enjoin further violations.

17. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

18.     Venue is proper under Section 12 of the Clayton Act (15 U.S.C. § 22), and under 28 U.S.C. § 1391(b) and (c), because Defendants transact business in this District and a substantial part of the events giving rise to Plaintiff's claims, including sales of HVAC Equipment, occurred in this District.

19.     This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) has manufactured, sold, shipped, and/or delivered substantial quantities of HVAC Equipment throughout the United States, including this District; (c) has substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

20.     The activities of Defendants, as explained in this Complaint, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

21.     No other forum would be more convenient for the parties and witnesses to litigate this case.

## III.   PARTIES

### A.   Plaintiff

22.    Plaintiff Daniel's Heating & Cooling Co. is an Illinois corporation with its principal place of business in Deerfield, Illinois. During the Class Period, it purchased HVAC Equipment manufactured by Defendants Daikin and Goodman, directly from those Defendants, and it is therefore a direct purchaser of HVAC Equipment. Plaintiff suffered injury as a result of Defendants' conduct as alleged herein.

### B.   Defendants

#### 1.   The Daikin Defendants.

23.    Defendant Daikin Industries, Ltd. ("Daikin") is a publicly traded corporation headquartered and incorporated in Osaka, Japan. Daikin's United States corporate headquarters are located in New York, New York. In 2022, Daikin acquired ThermalNetics, an HVAC Equipment sales and services provider that is headquartered in Auburn Hills, Michigan. Daikin manufactures and markets HVAC Equipment under several different brands and product lines, including Daikin, Amana, Goodman, and others. During the Class Period, Daikin and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

9

24.     Defendant Daikin Comfort Technologies North America, Inc. is a subsidiary of Daikin Industries, Ltd., based in Waller, Texas. At its "Daikin Texas Technology Park" outside Houston, Texas, Daikin Comfort Technologies North America, Inc. engineers, manufactures, markets, and sells HVAC Equipment under several brand and product lines including Daikin, Goodman, Quietflex, and Amana. Daikin Industries, Ltd. changed the name of its United States subsidiary Goodman Global Group, Inc. to Daikin Comfort Technologies North America, Inc., in April 2022.

25.     Defendant Daikin Applied Americas is a subsidiary of Daikin Industries, Ltd., based in Minneapolis, Minnesota. Daikin Applied Americas manufactures and markets HVAC Equipment under the Daikin brand and several product lines.

26.     Defendant ThermalNetics, LLC is a subsidiary of Daikin Industries, Ltd., based in Auburn Hills, Michigan. ThermalNetics manufactures and markets HVAC Equipment under the Daikin brand and several product lines.

27.     Defendants Daikin Industries, Ltd., Daikin Comfort Technologies North America, Daikin Applied Americas, and ThermalNetics, LLC are referred to collectively as "Daikin" or the "Daikin Defendants" in this Complaint. The Daikin Defendants are manufacturers of HVAC Equipment in the United States, including, both residential and commercial HVAC Equipment. During the Class Period, Daikin

10

and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Daikin supplied HVAC Equipment to distributors, including in the State of Michigan and in this District.

### 2.    The Bosch Defendants.

28.    Defendant Robert Bosch LLC is a wholly owned subsidiary of Robert Bosch GmbH and serves as the corporate headquarters for North America. It is located in this District, in Farmington Hills, Michigan.

29.    Defendant Robert Bosch GmbH is a publicly traded corporation headquartered and incorporated in Gerlingen, Baden-Wurttemberg, Germany. Robert Bosch GmbH's United States corporate headquarters are located in Farmington Hills, Michigan. Robert Bosch GmbH manufactures and markets HVAC Equipment under several different brands and product lines, including Bosch, York, Champion, Coleman IVT, Luxaire, Hitachi, TempMaster, Guardian, and others. During the Class Period, Robert Bosch GmbH and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

11

30.    Defendant JC Residential and Light Commercial LLC ("JC RLC") is a subsidiary of Robert Bosch GmbH, and according to the Michigan Secretary of State's website is licensed to transact business in the State of Michigan. JC RLC was acquired by Robert Bosch GmbH in 2024 from Johnson Controls International plc's Residential and Light Commercial HVAC business in an all-cash transaction valued at $8.1 billion.

31.    Defendant Johnson Controls-Hitachi Air Conditioning North America LLC ("JCH North America") is a subsidiary of Robert Bosch GmbH. JCH North America was acquired by Robert Bosch GmbH; it was formerly a joint-venture between Johnson Controls and Hitachi Global Life Solutions, Inc. JCH North America remains a subsidiary of Robert Bosch GmbH, and according to the Michigan Secretary of State's website is licensed to transact business in the State of Michigan.

32.    Defendants Robert Bosch GmbH, Robert Bosch LLC, JC RLC, and JCH North America are referred to collectively as "Bosch" or the "Bosch Defendants" in this Complaint. The Bosch Defendants are manufacturers of HVAC Equipment in the United States, including, both residential and commercial HVAC Equipment. During the Class Period, Bosch and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to

12

purchasers in the United States. Upon information and belief, Bosch supplied HVAC Equipment to distributors, including Johnstone Supply, which has many locations in this District, including in Detroit, Ann Arbor, Farmington Hills, Flint, Kalamazoo, and many others.

### 3. The Trane Defendants.

33. Defendant Trane Technologies plc ("Trane Technologies") is a publicly traded corporation headquartered and incorporated in Dublin, Ireland. Trane's North American and United States headquarters are located in Davidson, North Carolina. Trane's common stock is listed and traded on the New York Stock Exchange under the ticker symbol "TT." In 2008, Ingersoll Rand Inc. acquired Trane Technologies plc for $10.1 billion, holding it as a subsidiary before spinning it off into a dedicated climate control company in March 2020. Trane Technologies operates commercial sales offices for HVAC Equipment in both Flint and Livonia, Michigan. Trane Technologies also operates an HVAC Equipment commercial manufacturing operation in Grand Rapids, Michigan. Indeed, Trane Technologies' website includes a page entitled "Contact a Trane HVAC Dealer in Michigan," and lists over 40 locations in the State of Michigan. Trane Technologies manufactures and markets HVAC Equipment under several different brands and product lines, including Trane, American Standard, RunTru, Ameristar, Oxbox, and others. During the Class Period, Trane and/or its predecessors, wholly owned or controlled

13

subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

34. In 2008, Ingersoll Rand Inc. acquired Trane for $10.1 billion, holding it as a subsidiary before spinning it off into a dedicated climate control company in March 2020.

35. Defendant Trane U.S. Inc. is a manufacturer of HVAC systems, building management controls, and energy-efficient indoor climate solutions for residential and commercial applications. Trane U.S. Inc. is a subsidiary of Trane Technologies plc, and according to the Michigan Secretary of State's website, is licensed to do business in the State of Michigan.

36. Defendant Mitsubishi Electric Trane HVAC US is a 50/50 joint venture between Trane Technologies plc and Mitsubishi Electric US, Inc., formed in 2018. The joint venture distributes products under the Mitsubishi Electric brand, as well as specific Trane and American Standard branded systems. Mitsubishi Electric Trane HVAC US is headquartered in Suwanee, Georgia.

37. Defendants Trane Technologies, Trane U.S. Inc., and Mitsubishi Electric Trane HVAC US are referred to collectively as "Trane" or the "Trane Defendants" in this Complaint. The Trane Defendants are manufacturers of HVAC Equipment in the United States, including, both residential and commercial HVAC

14

Equipment. During the Class Period, Trane and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Trane supplied HVAC Equipment to distributors, including in the State of Michigan and in this District.

### 4.     The Carrier Defendants.

38.     Defendant Carrier Global Corp. ("Carrier Global") is a publicly traded Delaware corporation headquartered in Palm Beach Gardens, Florida. Carrier's common stock is listed and traded on the New York Stock Exchange under the ticker symbol "CARR." Carrier Global operates a commercial servicer for HVAC Equipment in Novi, Michigan. Indeed, Carrier Global's website includes a page entitled "Find a Carrier Expert – Michigan," which identifies over 100 locations in the State of Michigan. Carrier Global manufactures and markets HVAC Equipment under several different brands and product lines, including Carrier, Bryant, Toshiba, Payne, Tempstar, Airquest, Arcoaire, Beretta, Comfortmaker, Heil, Keeprite, Day & Night, Viessmann, and others.

39.     Defendant Viessmann Manufacturing Co. (U.S.), Inc. is part of the larger Viessmann Climate Solutions entity that Carrier acquired in 2024 and was Viessmann's primary manufacturing and distribution facility in the United States.

15

It is now a subsidiary of Carrier and is located in Warwick, Rhode Island. Carrier, as used herein, includes Viessmann Manufacturing Co. (U.S.), Inc.

40.     Defendants Carrier Global Corp. and Viessmann Manufacturing Co. (U.S.), Inc. are referred to collectively as "Carrier" or the "Carrier Defendants" in this Complaint. The Carrier Defendants are manufacturers of HVAC Equipment in the United States, including, both residential and commercial HVAC Equipment. During the Class Period, Carrier and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Carrier supplied HVAC Equipment to distributors, including in the State of Michigan and in this District.

**5.     The Lennox Defendants.**

41.     Defendant Lennox International, Inc. ("Lennox International") is a publicly traded Delaware corporation headquartered in Richardson, Texas. Lennox's common stock is listed and traded on the New York Stock Exchange under the ticker symbol "LII." Lennox International, either itself or by/through its subsidiaries, operates stores selling its HVAC Equipment products in Livonia and Madison Hights, Michigan. During the Class Period, Lennox International and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC

16

Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

42. Defendant Lennox Industries Inc. ("Lennox Industries") is a wholly owned subsidiary of Lennox International. Lennox Industries is a Delaware corporation headquartered in Richardson, Texas. Lennox Industries manufactures and markets HVAC Equipment under the Lennox brand and several product lines.

43. Defendant Allied Air Enterprises LLC ("Allied Air") is a wholly owned subsidiary of Lennox Industries, Inc. Allied Air is a Delaware limited liability company headquartered in West Columbia, South Carolina. Allied Air manufactures and markets HVAC Equipment under several different brands and product lines, including Allied, Allied Commercial, Armstrong Air, AirEase, Ducane, and Concord.

44. Defendants Lennox International, Lennox Industries, and Allied Air are referred to collectively as "Lennox" or the "Lennox Defendants" in this Complaint. The Lennox Defendants are manufacturers of HVAC Equipment in the United States, including, both residential and commercial HVAC Equipment. During the Class Period, Lennox and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

17

Upon information and belief, Lennox supplied HVAC Equipment to distributors, including in the State of Michigan and in this District.

### 6. The Rheem Defendants.

45. Defendant Rheem Manufacturing Co. is a privately-owned manufacturer headquartered in Atlanta, Georgia. Rheem contracts with HVAC Equipment services in the Detroit, Michigan area. Rheem Manufacturing Co. entered commercial markets for HVAC Equipment in the 1970s when it acquired Acme Industries, which was headquartered in Jackson, Michigan. Rheem Manufacturing Co. is a subsidiary of Paloma Industries, Ltd., a privately held company based in Nagoya, Japan, which acquired Rheem Manufacturing Co. in 1988. Rheem Manufacturing Co. manufactures and markets HVAC Equipment under several different brands and product lines, including Rheem, Ruud, WeatherKing, Sure Comfort, and others. In October 2024, Rheem Manufacturing Co. acquired Nortek Global HVAC from Madison Industries.

46. Defendant Rheem Manufacturing Co. is a manufacturer of HVAC Equipment in the United States, including, both residential and commercial HVAC Equipment. During the Class Period, Rheem and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, Rheem supplied

18

HVAC Equipment to distributors, including in the State of Michigan and in this District.

### 7. The AAON Defendants.

47. Defendant AAON, Inc. ("AAON, Inc. (Nevada)") is a publicly traded Nevada corporation headquartered in Tulsa, Oklahoma. AAON's common stock is listed and traded on NASDAQ under the ticker symbol "AAON." AAON manufactures and markets primarily commercial HVAC Equipment, including rooftop units, air handling units, chillers, and condensing units. Airtech Equipment is the primary authorized representative for AAON HVAC Equipment in Michigan, with offices both in this District in Detroit, as well as in Grand Rapids. During the Class Period, AAON and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

48. Defendant AAON, Inc. ("AAON, Inc. (Oklahoma)") is a subsidiary of the AAON Inc. entity referenced above in the immediate prior paragraph. AAON, Inc. (Oklahoma) is incorporated in Oklahoma and AAON, Inc. Oklahoma engineers, manufactures, and sells highly configurable HVAC systems.

49. Defendant AAON Coil Products, Inc. is a Texas corporation and subsidiary of AAON, Inc. AAON Coil Products, Inc. engineers and manufactures

19

semi-custom and custom HVAC systems, as well as heating and cooling coils for use in HVAC Equipment.

50. Defendant BASX, Inc. is an Oregon corporation and subsidiary of AAON, Inc. BASX engineers, manufactures, and sells a wide-range of custom, high-performance cooling solutions and highly customized air handlers and modular solutions for a variety of markets.

51. Defendants AAON, Inc. (Nevada), AAON, Inc. (Oklahoma), AAON Coil Products, Inc., and BASX, Inc. are referred to collectively as "AAON" or the "AAON Defendants" in this Complaint. The AAON Defendants are manufacturers of HVAC Equipment in the United States, including both residential and commercial HVAC Equipment. During the Class Period, AAON and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold HVAC Equipment in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Upon information and belief, AAON supplied HVAC Equipment to distributors, including in the State of Michigan and this District.

## IV. AGENTS AND CO-CONSPIRATORS

52. Co-Conspirator Air-Conditioning, Heating, and Refrigeration Institute ("AHRI") is the trade association that represents manufacturers of heating, ventilation, air conditioning, commercial refrigeration, and water heating equipment

in North America. AHRI is based in Arlington, Virginia. As alleged elsewhere herein, AHRI, at a minimum, facilitated the conspiracy alleged herein, and moreover, AHRI's Board of Directors is comprised of, in substantial part, executives of several Defendants, as detailed infra. Further investigation and access to discovery will provide more clarity on the full scope of AHRI's role in the conspiracy.

53.    Various other persons, firms, and corporations not named as Defendants have participated as Co-Conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. The Defendants are jointly and severally liable for the acts of their Co-Conspirators whether or not the Co-Conspirators are named as Defendants in this Complaint.

54.    The acts alleged herein that were done by each of the Co-Conspirators were fully authorized by each of those Co-Conspirators, or ordered, or done by duly authorized officers, managers, agents, employees, or representatives of each Co-Conspirator while actively engaged in the management, direction, or control of its affairs. The acts charged in this Class Action Complaint as having been done by Defendants were authorized, ordered, and/or done by their officers, agents, employees, and/or representatives, while actively engaged in the management of their business and affairs.

55.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

56.     Each Defendant named herein acted as the agent or joint venturer of, or on behalf of, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

57.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## V.     FACTUAL ALLEGATIONS

58.     Plaintiff alleges that Defendants entered into an agreement from at least as early as January 1, 2020, through the present to exchange price signaling statements and competitively sensitive information with the purpose of coordinating supracompetitive prices for HVAC Equipment and the effect of generating historic profit margins.

### A.     Industry Background

#### 1.     HVAC Equipment

59.     The market for HVAC equipment includes products for both residential and commercial applications.

### a.       Residential HVAC Equipment.

60.      Residential HVAC Equipment is just that: HVAC Equipment designed for residential use. Such systems tend to be smaller and simpler than their commercial counterparts. They often feature a "split" system, that is, one indoor unit and one outdoor condenser.

61.      Residential HVAC Equipment includes systems that regulate indoor temperature, humidity, and air quality in homes. Key components of residential HVAC systems include furnaces, heat pumps, air conditioners, and air handlers. These work, often together, to move heated or cooled air throughout the home via ductwork.

62.      Residential heating equipment includes furnaces (which use gas, oil, or electricity) and heat pumps, which provide heat by transferring warmth from the air. Residential cooling equipment, as well as heat pumps, remove heat and humidity from indoor air, releasing it outside.

63.      Air handlers, with blower motors, push conditioned air through ducts. Ductwork and venting distribute air throughout the home. Residential HVAC systems often include air quality components, such as filters that remove particulates, and systems like dehumidifiers or humidifiers to balance moisture levels.

23

64.     There are three primary types of residential HVAC systems: (1) split systems, which have separate indoor (furnace/air handler) and outdoor (condenser) components; (2) packaged units, where all components are combined into one outdoor unit (often used in homes without basements); and (3) ductless "mini-splits," which are individual units for cooling/heating specific rooms without needing ductwork. Ductless "mini-splits" are not included in the product definition in this case.

### b.     Commercial HVAC Equipment.

65.     Commercial HVAC Equipment usually involve more complex requirements than their residential counterparts, such as controlling different temperatures in different rooms, zones, or offices within a building. Commercial HVAC Equipment are designed for high-capacity heating and cooling, and are often modular, rooftop units that combine heating and cooling, allowing for multiple units to be used in one building (e.g., in applications such as apartments, hotels, office buildings, and data centers).

66.     Most companies offer rooftop HVAC units (also known as RTUs), which are commercial only systems. They are typically used on shops, restaurants, mini-malls, and the like. These are "all-in-one" systems that sit on the roof and handle heating, cooling, and ventilation for smaller commercial buildings. For

24

example, Lennox offers "Rooftop Units" for commercial buildings, as do Daikin and Bosch (through its acquisition of Johnson Controls and its York brand).

67. A typical commercial rooftop system is a self-contained system that bundles all the main refrigeration, air-moving, heating, and control components in one cabinet. The parts consist of refrigeration (compressor, condenser coil, condenser fan, expansion device, and evaporator coil). There is also an air-handling section (fan, return-air path, outdoor-air intake hood, and air filters) as well as a heating unit. There are also controls and safety devices such as thermostats, sensors, and control boards.

68. As an alternative to a rooftop unit, Defendants also offer ducted and split systems. These are separate indoor and outdoor units connected by ducts that can be built into ceilings, boiler rooms, or utility closets in offices and other commercial buildings. These combine an outdoor condensing unit with an indoor air handler, running through ducts rather than as a single rooftop box. These include Bosch's commercial "split systems," Daikin's commercial split heat pumps, Carrier's "Split Systems and Air-Cooled Condensers," Lennox's commercial mini-split systems, and Rheem's "Split Air Conditioners."

69. A typical commercial split system has two main pieces: an outdoor condensing unit and an indoor air handler, connected by refrigerant lines. The

outdoor unit houses the compressor, condenser coil, and outdoor fan, while the indoor unit contains the evaporator coil, supply fan/blower, and air filter.

70.     For larger buildings, Defendants offer some form of multi-zone heat pump system. This includes variable refrigerant flow ("VRF") systems for offices, hotels, and other large commercial buildings. These systems offer room-by-room control and are refrigerant-only, connecting many indoor units to one or more outdoor devices to modulate refrigerant flow to each zone. They use a network of refrigerant piping to connect the outdoor systems to the indoor ones and then use compressors to vary how much refrigerant each indoor unit gets so each zone can be heated or cooled independently. Examples include Daikin's air-cooled and water-cooled VRV systems,[2] Trane's air-source, water-source, and hybrid VRF systems, Carrier's air-source and heat recovery VRF systems, and Bosch's air-source and water-source VRF systems.

71.     A VRF has several groups of parts. The outdoor unit has the main compressor (the part that pumps the refrigerant) and a fan to expel heat to the outdoors. In many buildings, there are several connected outdoor units to get more capacity. The indoor unit has a fan coil to heat or cool the air, a fan to blow air into

---

[2] Daikin trademarked the variable refrigerant volume ("VRV") term, but VRF and VRV systems are technologically the same. See Daikin, VRV and VRF Systems (Variable Refrigerant Volume/Flow), available at https://www.daikin.co. uk/en_gb/about/daikin-innovations/variable-refrigerant-volume.html (last accessed Apr. 20, 2026).

the ducts, and a filter to clean the air. Thin refrigerant pipes run from the outdoor unit to all the indoor units.

72.   For the largest commercial and institutional structures, Defendants sell chillers. These are for buildings like office towers, hospitals, and college campuses. Chillers make cold water for entire buildings. The VRF systems and chillers feed air-handling units inside the building, which do the work of moving, filtering, and heating or cooling the air.

73.   A typical commercial chiller contains all the main refrigeration components in one package: a compressor, evaporator, condenser, expansion device, and associated controls, valves, and power gear.

### B.   Market Distribution and Size

74.   An approximation of market size distribution for each HVAC Equipment application is shown below.

27

**Figure 2**



2020 Market Share Percentage

**C.     Pricing Basics in the HVAC Equipment Industry**

75.     Pricing of residential HVAC Equipment is generally consistent across the Defendants' brands, with ranges between $4,000–$13,000 depending on the model customers select. Model prices vary based on efficiency ratings, speed varieties, size/capacity, noise-reduction, and other factors. Residential HVAC Equipment installation factors such as labor costs, home sizes and duct-work, and the complexity of the systems being installed lead to significant variabilities in overall consumer cost.

76.     Pricing of commercial HVAC Equipment is also generally consistent across the Defendants' brands, with ranges between $5,000 to over $100,000 depending on the commercial application. For instance, a small retail shop is going to require a much smaller system than a warehouse. Commercial HVAC Equipment

28

prices also vary based on efficiency ratings, size/capacity, and type of system. Commercial HVAC Equipment installation factors such as labor and equipment costs, permit and inspection fees, and design and engineering costs, and duct-work also lead to variabilities in overall cost.

### D.     Overview of Defendant-Manufactured Products

77.     Bosch produces inverter ducted split ("IDS") heat pumps, geothermal water pumps, residential and commercial heat pump systems, commercial packaged rooftop and split units, air handling units, various furnaces, and air purifiers, among others. Bosch offers a range of products within each of these categories of HVAC Equipment, including through other brand names.

78.     Trane produces residential products such as air conditioners, furnaces, and heat pumps. Trane's line of commercial products includes airside equipment, chillers, commercial heat pumps, cooler distribution units, packaged units and split systems, VRF heating and cooling systems, and geothermal pumps. Trane offers a range of products within each of these categories of HVAC Equipment, including through other brand names.

79.     Carrier produces residential products such as air conditioners, furnaces, heat pumps, crossover solutions, evaporator coils, geothermal pumps, and fan coils. Carrier's line of commercial products includes airside equipment, chillers, packaged indoor and outdoor units, split systems and condensers, and VRF systems. Carrier

offers a range of products within each of these categories of HVAC Equipment, including through other brand names.

80.     Daikin produces a range of residential and commercial products such as split/multi-split type air conditioners, unitary (ducted split) systems, air to water heat pump systems, air purifiers, heating systems, packaged air conditioners, medium/low temperature refrigeration, ventilation products, rooftop systems, air cooled chillers, water cooled chillers, airside equipment, and VRV systems. Daikin offers a range of products within each of these categories of HVAC Equipment, including under other brand names.

81.     Lennox produces a range of residential and commercial products such as air conditioners heat pumps, furnaces, air handlers, packaged units, indoor air quality units, water heaters, unit heaters, and duct furnaces. Lennox offers a range of products within each of these categories of HVAC Equipment, including under other brand names.

82.     Rheem produces a range of residential products such as air conditioners, air handlers, furnaces, heat pumps, and water heaters. Rheem also produces a range of commercial products such as air handlers, packaged air conditioners, packaged gas electric units, packaged heat pumps, split air conditioners, split heat pumps, electric water heaters, gas water heaters, heat pump water heaters, storage tanks, tankless electric water heaters, and tankless gas water

30

heaters. Lennox offers a range of products within each of these categories of HVAC Equipment, including under other brand names.

83.     AAON manufactures a range of primarily commercial products such as packaged rooftop units, split systems, air handling units, and condensing units, among others. AAON offers a range of products within each of these categories of HVAC Equipment, including under other brand names.

### E.     The Air-Conditioning, Heating, and Refrigeration Institute

84.     Participants in a conspiracy often rely on a closely controlled industry trade association to facilitate information sharing, provide opportunities to meet in person, and otherwise monitor and enforce their conspiracy. In the HVAC Equipment conspiracy, AHRI played this role.

85.     AHRI is the trade association that represents manufacturers of heating, ventilation, air conditioning, commercial refrigeration, and water heating equipment in North America. It is largely controlled by Defendants and their senior executives. The AHRI Board of Directors is comprised of multiple senior HVAC executives and board members. For example, the 2026 AHRI Board includes: (1) Trane's President of HVAC Americas, Holly Paeper; (2) Carrier's President of Climate Solutions Americas, Gaurang Pandya; (3) Lennox's CEO, Alok Maskara; (4) Daikin's senior executive, Yogi Uemura; (5) Rheem's President of Global Air, Mike Branson; and (6) Bosch's Regional President Americas, David Budzinski.

31

86. AHRI purports to "act[] as an impartial central agency for gathering individual company data and distributing it in summaries covering bookings, unit shipments, sales volume, manufacturer inventories, exports, efficiencies, and market information on trading area sales."

87. AHRI follows a give-to-get model for information sharing. In order for members to receive industry data, they must provide that same data for their own company. AHRI states that "AHRI statistical data is not for sale," and instead is only available to HVAC Equipment companies that also provide AHRI (and their competitors) their own confidential data.

88. AHRI's HVAC Equipment information "is compiled in various reporting formulas and distributed in aggregate form to participants in monthly, quarterly, semi-annual, or annual reports." Indeed, AHRI boasts that they turn participants' data into "an industry report that they get so they can really get an idea of exactly where they stand in the market for [each] product" they manufacture for the AHRI "statistics program that consists of over 150 reports covering over 30 different product types." The reports are "based on what the members would like to buy in the reports, what data they'd like to provide."

89. At the start of the conspiracy in 2020, AHRI launched a new "Analytics App and Executive Dashboard," which it describes as follows:

> In 2020 AHRI launched the Executive Dashboard
> to provide certification program participants with

32

real-time program performance data, industry statistics, and the predictive analytics needed to drive results. As part of our commitment to further develop our suite of data analytics services, we are proud to introduce the AHRI Analytics App. This exciting new tool is designed to enhance the user's experience by providing access to data related to individual product performance, which can then be compared to the data of other AHRI certification program participants, along with predictive analysis.

90. AHRI has a Standards Policy Committee (StdC) that "defines the policies and procedures related to development and approval of AHRI standards, guidelines, and stand-alone appendices." In 2024, for example, AHRI's StdC was Chaired by Darcy Lee of Trane. Voting members of the StdC in 2024 also included: Dominique Taudin of Carrier, Bruce Perkins of Lennox, Sachin Nehete of Rheem, and Patrick Marks of Johnson Controls (now Bosch).

91. AHRI also has a chat platform called "AHRI Connect," a portal where "members and invited guests interact with other air conditioning, heating, and refrigeration industry leaders and technical experts" and which allows its users "to join communities where they can take part in vibrant discussions and work collaboratively with colleagues across the globe, access documentation instantaneously, and stay abreast of critical news updates."

33

92.     An example of the information available in just one of AHRI's reports, a monthly report called "Air Conditioning Today", includes the following information:

> **Notes and FAQs**
> *A shipment is defined as when a unit transfers ownership; a consignment is not a transfer of ownership. Industry data is aggregated from the information supplied by AHRI member  companies that participate in the statistics program and can be subject to revision. Published year-to-date data is inclusive of all revisions. No other AHRI data (e.g., by state or region) is available to the public  other than that published. AHRI does not conduct any market forecasting and is not qualified to discuss market trends. BTUHs of 64.9 and below are for residential units;*
> *65.0 and above for commercial. For previous monthly shipment releases and historical data, please see http://www.ahrinet.org/statistics.*
>
> **How do my colleagues subscribe to the report?**
> *Go to http://www.ahrinet.org/statistics and click on Subscribe.*
>
> **Does this data represent shipments to the United States only or are shipments outside of the United States included?**
> *This data represents shipments to customers in the United States only.*
>
> **Do you provide U.S. data by state?**
> *That data is not available publicly.*
>
> **Is historical data available in Excel?**
> *It is available monthly reflecting exactly the data presented in the monthly public release.*

34

**Is data available in a different format?**
*The only format available is provided on the website.* **Does the December YTD data equal full calendar year?** *Yes, it does.*

**Can I purchase additional industry data from AHRI?**
*No, AHRI statistical data is not for sale.*

**Does AHRI provide information for academic research purposes?**
*AHRI is not authorized by our members to provide information other than what is listed on our website.*

**How much of the industry does the data represent?**
*Although we cannot get into specifics about how much of the industry the data represents, in general, AHRI is one of the largest trade associations in the nation, representing more than 300 heating, water heating, ventilation, air conditioning and commercial refrigeration manufacturers within the global HVACR industry. AHRI's 300+ member companies account for more than 90 percent of the residential and commercial air conditioning, space heating, water heating, and commercial refrigeration equipment manufactured and sold in North America.*

**Is it accurate to use the number for year-to-date U.S. shipments as a measure of sales?**
*AHRI reports track shipments, which are defined as when a unit transfers ownership. While some people use the terms shipments and sales interchangeably, they may not be the same.*

35

93.     AHRI has at least two in-person board meetings each year. In 2026, those meetings are scheduled for June in Arlington, Virginia (where AHRI is based) and for November in Puerto Rico.

**F.     Pre-2020: Stable Pricing Aligned with CPI and Household Appliance PPI**

94.     Prior to the onset of Defendants' conspiracy in or about January 2020, HVAC Equipment prices were generally stable, with modest increases that tracked broader consumer inflation and the Household Appliance PPI, consistent with normal, competitive market conditions.

95.     As reflected in Figure 1, supra, through the end of 2019, the HVAC PPI consistently tracked the CPI and the Household Appliance PPI. That all began to change in January 2020, when Defendants launched their conspiracy. The fruit of their efforts became increasingly apparent as the spread between the HVAC PPI and the CPI grew exponentially.

96.     In early 2019, some HVAC companies sought to increase prices, but they were not successful or as large of increases in the margin between costs and price because not enough HVAC companies announced prices together. For instance, on February 13, 2019, Nortek Air (now part of Rheem) announced a 6% increase for the first quarter of 2019. But other companies did not make similar announcements, so following through on and making the price increase stick was more difficult. Defendants needed a better boogeyman to blame, and they found it

36

in early 2020 with the onset of COVID-19, which purchasers accepted as a legitimate reason for price increases, even though it was not.

### G.    Defendants' Conspiracy to Fix Prices of HVAC Equipment

#### 1.    2020: COVID-19 Pandemic and the Phasedown of HFCs Under the AIM Act Create Cover for Coordinated Pricing

97.    Around January 1, 2020, Defendants initiated their conspiracy using the COVID-19 pandemic and the HFC phase-down under the AIM Act as both opportunity and pretext. They began relying on publicly announced price increases, most often made through ACHR News. ACHR News is billed as the "the weekly newsmagazine of the HVACR contractor covering residential and commercial contracting," and its website appears to have centralized reporting on the specifics of each price increase announcement. Almost all of the price increases that follow in this section of the Complaint were announced through ACHR News.

98.    On or around January 1, 2020, and before Defendants had the COVID-19 excuse to blame for price increases, some Defendants announced price increases. For instance, on November 15, 2019, Lennox announced a price increase of 3-6% effective January 1, 2020. On November 18, 2019, AAON announced a price increase of 5% effective December 5, 2019. On December 5, 2019, Amana (Daikin) and Goodman (Daikin) announced a price increase of 6% effective February 1, 2020. On December 13, 2019, Allied Air announced 4-6% increase effective

February 1, 2020. Tellingly, so many of these increases were publicly announced, primarily through ACHR News.

99.    In early February 2020, AHRI held its annual meetings in Orlando, Florida. At the time, AHRI's Vice Chairman was Mike Schartz, CEO of Daikin Applied. AHRI's Board of Directors then included Gary Bedard, EVP, President, and COO Worldwide Refrigeration at Lennox, Mike Branson, President at Rheem, Elizabeth Haggerty, VP and GM Global Ducted Systems at Johnson Controls, Chris Nelson, President Residential and Commercial Systems at Carrier, and Donny Simmons, President Commercial HVACR at Ingersoll Rand (which at the time, was Trane's parent). Upon information and belief, ACHR News staff were present at and attended the AHRI conference and provided coverage of all AHRI and other industry conferences.

100.   Then came the COVID-19 pandemic in early 2020, which presented a golden opportunity for Defendants to implement their price fixing conspiracy. No customer could question that the pandemic had the potential to disrupt supply chains, so coordinated price increases suddenly became seemingly justifiable, eventually driving the prices of some HVAC Equipment to record highs, at levels that vastly exceeded the Consumer Price Index, as alleged herein.

101.   Johnson Controls announced, through ACHR News, in August 2020 it was "implement[ing] a price increase of up to six percent on residential and

38

commercial heating and cooling products," effective October 1, 2020. Johnson Controls attributed the increase to challenges related to the COVID-19 pandemic and the "escalating frontline manufacturing costs" that resulted.

102. Trane was the next to announce a price increase of up to 6% on September 30, 2020 for select commercial "Trane unitary, applied, and controls equipment," effective November 7, 2020. Again, Trane made its price increase announcements through ACHR News.

103. Next, on October 30, 2020, AAON announced a 4% price increase on select commercial HVAC Equipment, effective January 11, 2021. Similarly, AAON announced its price increase through ACHR News.

104. Trane tested the waters again on November 2, 2020, announcing price increases of up to 8%. It was reported that "[t]he increase, effective January 1, 2021, applies to Trane, American Standard Heating & Air Conditioning, RunTru by Trane and Ameristar equipment, and all parts and supply brands."

105. Lennox quickly followed Trane's lead, announcing on November 9, 2020 that it would increase prices by 4–6% on all residential and commercial equipment, effective January 18, 2021.

106. The next month, on December 9, 2020, Nortek Air Solutions, another HVAC manufacturer and now part of Rheem, announced a price increase ranging from 3–9% on all its products. The company blamed the increase on "recent rises in

39

labor rates, third-party component vendor prices, and a cost escalation on steel, copper, aluminum, and other commodities."

107.   Later that same month, Nortek separately announced a 6% price increase on residential and commercial products, effective March 1, 2021.

108.   Like its parent company, Lennox, did the month prior, Allied Air announced an identical price increase of 4–6% on December 21, 2020, effective February 1, 2021, "due to inflationary pressures [] due to transportation and input costs."

109.   At the end of the year, on December 27, 2020, Congress enacted the AIM Act, which mandated the phasedown of HFCs. This prohibition covered R-410A, the primary refrigerant used in air conditioning condensers and heat pumps at the time. Beginning on January 1, 2025, the AIM Act prohibited Defendants from manufacturing or importing new R-410A systems. This provided further cover and pretext for Defendants to engage in conspiratorial price increases.

### 2.    2021: Defendants Intensify Coordinated Pricing Practices

110.   On March 8, 2021, Trane announced a price increase of up to 7.5% for its commercial HVAC Equipment, effective April 9, 2021.

111.   AAON followed with a price increase on commercial HVAC Equipment the next day, raising prices by 4% on all HVAC Equipment, effective

40

June 1, 2021. The company blamed the impact of rising raw material prices on component costs.

112.   Later that month, on March 31, 2021, Trane announced an additional price increase specific to residential HVAC Equipment of up to 6%, effective April 1, 2021.

113.   Less than two weeks later, on April 12, 2021, Lennox announced a similar price increase of 6–9% on all residential and commercial HVAC Equipment. Elliot Zimmer, President and CEO of Lennox Commercial, blamed "inflationary pressures on raw material costs." Quan Nguyen, VP and General Manager of Lennox Residential, explained, "These increases on steel, copper, plastics, and integrated components require us to pass these costs through the value chain." However, as discussed in this Complaint, such pretextual excuses for price increases do not explain the magnitude and level of price increases seen during the Class Period.

114.   Three days later, on April 15, 2021, Daikin announced a price increase of 6% on all commercial heating and cooling HVAC Equipment, effective April 26, 2021.

115.   Four days after Daikin's announcement, on April 19, 2021, Lennox subsidiary Allied Air announced a price increase of between 5–7% beginning June 1, 2021 "[d]ue to inflationary commodity and operational costs."

41

116.   Effective June 1, 2021, Carrier increased prices by up to 7% on North American residential, light commercial, and commercial HVAC Equipment.

117.   On June 17, 2021, AAON announced it would be raising prices for the third time in under a year, this time by 5%. Effective September 1, 2021, AAON blamed the price increases on "inflationary pressures."

118.   Johnson Controls (now part of Bosch) implemented a price increase of 3.5% on HVAC Equipment, effective July 1, 2021.

119.   On July 2, 2021, Trane announced price increases of up to 7% on select commercial HVAC Equipment, effective August 7, 2021.

120.   Then, on July 9, 2021, Trane announced a price increase of up to 7% on select residential HVAC Equipment that shipped on or after August 9, 2021.

121.   Five days later, Carrier followed suit, announcing price increases of up to 8% on all "North America residential, light commercial, and commercial applied products effective September 1, 2021."

122.   Less than two weeks later, on July 23, 2021, Lennox announced an identical 8% price increase on residential and commercial HVAC Equipment "due to further rise in inflationary costs," effective September 1, 2021.

123.   Lennox subsidiary Allied Air also announced an 8% price increase that same day, effective October 1, 2021, "due to inflationary pressures from transportation and input costs."

124. Nortek Air Solutions (now part of Rheem) showed its support for its competitors' price increases when on August 10, 2021, it announced increases of its own from 8–12% on all HVAC Equipment, effective August 16, 2021. The company pretextually explained, "The increase is a result of surging commodity prices and continued availability shortages on materials such as steel, copper, aluminum, and resin, along with third-party component vendor price increases."

125. Daikin announced an identical 8% price increase on September 3, 2021, taking effect on select commercial HVAC Equipment that shipped after January 1, 2022.

126. On September 21, 2021, AAON announced its fourth price increase over the prior 12 months. The company implemented another 5% price increase, effective January 1, 2022, citing "inflationary pressures" once again.

127. Blaming "persistent cost inflation," Lennox announced an additional 13% price increase for commercial HVAC Equipment on October 18, 2021.

128. Carrier announced on October 26, 2021, a price increase effective January 10, 2022 of up to 12% on North American commercial HVAC Equipment and up to 10% on residential HVAC Equipment.

129. On November 3, 2021, Lennox announced a further price increase of up to 13% on residential HVAC Equipment, effective January 1, 2022.

43

130. On November 12, 2021, Allied Air (Lennox) announced a comparable price increase of up to 12% effective January 1, 2022, again pointing to "persistent inflationary costs."

131. Trane followed three days later, announcing an identical price increase of up to 12% on residential and commercial HVAC Equipment. Like Carrier, Lennox, and Allied Air, Trane made its residential price increases effective January 1, 2022, and its commercial price increases effective January 15, 2022. A succession of closely timed, substantial price increases like this was unprecedented in the HVAC Equipment industry.

132. Defendants publicly acknowledged these parallel price increases. In an August 2021 earnings call, Trane CEO Dave Regnery publicly boasted that "from what we're seeing in the market, the entire industry, are implementing price changes faster and with far less lag time … ." For the Trane Defendants, their ability to coordinate price timing with competitors can be attributed to their ability "to really hone in what we need to do in pricing real time almost."

133. Defendants appeared unconcerned that competitors would undercut them or capture market in response to these price increases. When asked whether competitors were trying to grab market share amid rising prices, Lennox CEO Todd Bluedorn pointed to parallel price increases across competitors in 2021 and responded, "we're all in the pool together."

44

### 3.    2022: The Conspiracy Gains Momentum

134.    On March 2, 2022, AAON announced a further 7% price increase on all commercial HVAC Equipment as "a result of inflationary pressures," effective March 29, 2022.

135.    One week later, on March 9, 2022, Carrier announced a price increase of up to 9% on North American residential, light commercial, and commercial HVAC Equipment, effective April 11, 2022.

136.    Less than three weeks after Carrier's announcement, Lennox announced on March 28, 2022, a matching price increase of up to 9% on residential and commercial HVAC Equipment, effective May 2, 2022.

137.    On April 4, 2022, Trane announced a price increase of up to 9%—identical to the price increases announced by Carrier and Trane less than one month prior—on residential and commercial HVAC Equipment, effective May 1, 2022.

138.    On April 18, 2022, Lennox subsidiary Allied Air announced a price increase of up to 9%, effective June 1, 2022, again pointing to "persistent inflationary costs."

139.    A slew of commercial-specific increases on HVAC Equipment occurred throughout the duration of 2022. Daikin was first with its May 10, 2022 announcement of price increases of up to 12% on commercial HVAC Equipment, effective May 25, 2022. One week later, on May 17, 2022, Trane announced a price

45

increase of up to 18% on select commercial HVAC Equipment, effective one day prior. Hot on the heels of the announcements from Daikin and Trane, on May 26, 2022, Carrier announced a price increase of up to 12% on North American light commercial and commercial HVAC Equipment, effective July 11, 2022.

140.   Beginning June 1, 2022, AAON "implemented a 1% per month price increase." This rolling price increase allowed AAON "to realize more pricing each month," with the company reporting on May 4, 2023, that "pricing compris[ed] 22.0% of growth."

141.   The next month, on June 28, 2022, Lennox announced a price increase of up to 14% on commercial HVAC Equipment, effective August 1, 2022, due to "persistent cost inflation and regulatory transition."

142.   Lennox's subsidiary, Allied Air, also announced a price increase of up to 14% on commercial HVAC Equipment on July 25, 2022, because of "inflationary pressures to due to transportation and input costs," effective August 1, 2022.

143.   A mere four days later, on July 29, 2022, Daikin announced an increase of up to 5% on commercial HVAC Equipment for all orders beginning on August 31, 2022.

144.   Trane very nearly matched Daikin's price increase, announcing on September 9, 2022, a further 3–6% increase of its own on commercial HVAC Equipment, effective September 10, 2022. Right before implementing this price

increase, Trane publicly signaled to its competitors that prices should not come down, stating in its August 2022 earnings call that "we don't see prices coming down."

145.   On November 14, 2022, Carrier announced a further price increase of up to 8% on North American commercial HVAC Equipment, effective December 5, 2022.

146.   "Due to persistent cost increases," Lennox announced on December 5, 2022, that it would be increasing residential and commercial HVAC Equipment prices by as much as 8%, effective January 1, 2023.

147.   Similarly, "due to inflationary pressures to [sic] due to transportation and input costs," Lennox subsidiary Allied Air announced a price increase on December 9, 2022, of up to 8% on residential and commercial HVAC Equipment, effective January 1, 2023.

148.   The very same day, Trane announced a price increase of up to 10% on residential HVAC Equipment, effective January 9, 2023.

### 4.    2023: The Conspiracy Reaches New Heights

149.   In 2023, Defendants focused on preserving the supracompetitive price levels established from 2020 to 2022, often announcing price increase that functioned less to raise prices further and more to stabilize them and prevent significant declines  from record high prices levels.

47

150.   Trane announced its commercial HVAC Equipment price increases on January 9, 2023, about a month after its residential price increases, raising prices by 4–7.5%, effective January 14, 2023.

151.   Then on February 2, 2023, Trane publicly reported, "Strong volume growth, positive price realization and productivity more than offset material and other inflation related to supply chain challenges and higher costs to serve customers."

152.   Just five days later, Carrier issued a press release that almost mirrored Trane's announcement: "Strong price realization more than offset unprecedented inflation and productivity savings more than offset strategic incremental investments."

153.   From April 2–5, 2023, executives from Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem would all meet again in New Orleans for the Air Conditioning Contractors of America ("ACCA") 2023 Conference & Expo.

154.   On May 1, 2023, Trane announced another increase of 4–6% on commercial HVAC Equipment, effective May 5, 2023. Again, in tandem with this price increase, Trane publicly signaled to its competitors to remain disciplined on price, stating in its May 2023 earnings call that "[t]hings remain to be very disciplined as we see today" and that "it's an industry that typically retains price and is disciplined on price."

48

155. In July 2023, Lennox's CEO, Alok Maskara, stated, "Regarding price versus inflation, we are pleased to report that the industry pricing remains disciplined and our own mid-year price increase has been broadly successful." He continued, "Our outlook on both components and commodity cost inflation remains stable and unchanged, and we expect the second half of the year to deliver a positive price versus inflation spread."

156. On August 9, 2023, Bosch raised prices on heat pumps, citing "adjustments to market conditions and supply chain challenges."

157. On September 18, 2023, Trane announced price increases on commercial HVAC Equipment, ranging from 2% to 6%, effective October 7, 2023.

158. Lennox announced similar price increases on October 24, 2023, raising prices by up to 8% on commercial HVAC Equipment, effective January 1, 2024.

159. On November 14, 2023, Carrier announced a price increase of 8% on North American commercial HVAC Equipment, effective the following month.

160. Three days later, on November 17, 2023, Trane announced one final HVAC Equipment price increase for the year, raising prices by up to 5% on some residential products, effective January 1, 2024.

161. Lennox followed with price increases of its own less than two weeks later on November 30, 2023, increasing residential HVAC Equipment prices by up

to 10% because of "expected increases in the cost of R-410A refrigerant as well as other inflationary pressures." The price increases were effective February 5, 2024.

162.   On December 5, 2023, Lennox's Allied Air subsidiary announced price increases of up to 10% on residential and 12% on commercial HVAC Equipment. The company claimed the increases, effective January 2, 2024, were a "response to inflationary cost pressures."

### 5.   2024: The Conspiracy Became the Status Quo

163.   Carrier announced the first price increase of the year on January 5, 2024, raising prices by 6–10% on all products. Effective March 4, 2024, "The increase on residential products will be by a blended average of 6%, the increase on light commercial products will be by a blended average of 8%, and the increase on commercial applied products will be by a blended average of 10%."

164.   Effective January 12, 2024, Bosch raised prices on heat pumps by 6%. The company attributed the higher prices to "increased costs in raw materials and logistics."

165.   On January 18, 2024, Nortek Global HVAC (now part of Rheem) announced price increases of up to 8% on all residential HVAC Equipment, effective February 26, 2024.

166. Trane also announced price increases that month—six days after Nortek, on January 24, 2024. Trane raised prices on commercial HVAC Equipment by 2–6%, on average, effective February 10, 2024.

167. Effective February 1, 2024, Daikin increased prices of residential HVAC Equipment by up to 7%.

168. In September 2024, Lennox's CFO, Michael Quenzer, spoke about the remarkable shifts that had happened over the prior years in the HVAC Equipment industry, noting, "Yeah, shares don't shift a lot in our industry." Market share stability is a sign of collusion because it suggests that competitors have ceased competing for business on price.

169. On December 10, 2024, Trane raised prices of select commercial HVAC Equipment, effective January 12, 2025, with most increases falling in the range of 2–5%.

170. Over the course of 2024, Rheem—a private company—increased its HVAC Equipment prices by 8–15% through public price announcements.

### 6. 2025: Defendants Steadily Increase Prices by Embracing "Price Discipline"

171. Lennox subsidiary Allied Air kicked off the new year with a price increase announcement on January 2, 2025. The company raised residential parts and commercial HVAC Equipment prices by 5%, effective January 13, 2025.

51

172.   Effective February 1, 2025, Trane announced a 10% price increase on residential HVAC Equipment.

173.   On February 1, 2025, Daikin announced a price increase on all residential and commercial HVAC Equipment by 8–10%, effective April 1, 2025.

174.   Also on February 1, 2025, Daikin subsidiary Goodman announced a price increase on residential HVAC Equipment by 8–10%, effective April 1, 2025.

175.   Finally, on February 1, 2025, Daikin subsidiary Amana announced a price increase of 8–10% on all residential HVAC Equipment, effective April 1, 2025.

176.   Effective March 1, 2025, Carrier increases prices on residential HVAC Equipment by 6%, light commercial HVAC Equipment by 8%, and commercial HVAC Equipment by 10%.

177.   In April 2025, Rheem announced price increases on HVAC Equipment of approximately 6%. Also in April 2025, Lennox increased HVAC Equipment prices by another 6%. Effective May 1, 2025, Bosch increased heat pump prices by 2%.

178.   In July 2025, Lennox CEO Alok Maskara indicated that Defendants had no intention of easing price increases, stating that, "[i]f history is of any guide, us and other players will continue to be price disciplined."

179.   On September 10, 2025, at the 13th Annual Morgan Stanley Laguna Conference, David Gitlin, Chairman and CEO of Carrier, and Patrick Goris, Senior Vice President and CFO of Carrier, addressed analyst questions, including whether "there's price risk or price competition that could come to the resi market?" Carrier's Senior Vice President and CFO, Patrick Goris, sidestepped the question, instead emphasizing continued pricing strength, "What we've seen so far this quarter is that the combination of the price and the mix up is still double-digit positive. And so that is -- obviously, that's really good."

180.   Speaking at the same conference the next day, Michael Quenzer, CFO of Lennox, detailed Defendants' collective discipline and signaled Lennox's forthcoming price increases:

> Yeah, I think so far we've seen very rational pricing from all the OEMs. A lot of these OEMs have the same input costs as we do. They're seeing the same tariff pressures. They're seeing the same investments they had to make to switch to the new refrigerant products. **Very disciplined on the industry right now pushing price.** I expect price and cost to continue to go up. I don't think inflation is going to stop here. **I think the next level will be early next year when we all come out and announce our next full round of price increases.** For the balance of the year, I think we're pretty well set from a price perspective. **Next year, we'll do our annual price increase, and just like we always do, we expect similar results by others.**

181.   Trane's CEO Dave Regnery and CFO Chris Kuehn also spoke that day, with Regnery revealing in a prepared remark that tracks with Lennox's call for discipline, Trane had reduced production to manage supply: "We have taken some time out of our factory so that we can balance the inventory load within the channel."

182.   On September 27, 2025, Trane increased commercial HVAC Equipment prices, with most increases ranging from 1–4%. In Trane's October 2025 earnings call, Regnery again echoed his earlier call for discipline. When asked about his comfort level that price discipline could hold up as inventory destock played out, Regenery responded that "under resi, the industry has remained disciplined."

183.   In November 2025, Patrick Goris, Carrier's Chief Financial Officer and Senior Vice President, was asked by an analyst to discuss "this type of kind of industry-wide volume correction" and how "people start to ask about price and mix and those types of things. It doesn't sound like you see any sort of pressure from the OE, kind of the other OEs in terms of taking price down. I mean, if anything, it can still go up. Just kind of talk about the pricing environment in [the] industry right now where volumes are so pressured." Goris responded:

> It certainly is a watch item. Because as you say, when volumes are down so much, it's the natural question that comes up. In Q3, our overall pricing was up double digits year over year. Now that's a combination of the mix-up with the new units with the new refrigerant, which are more costly than the prior units, and some price increase. Some of that, of course, relates to some of the input cost increases

54

that we've seen. This quarter, the increase will probably be a little bit less year over year, but only because we're starting to lap quarters last year where we started selling the new refrigerant units. Our intention is still that we would announce a price increase in residential in the Americas for next year, likely in the mid-single-digit range. One of the reasons is we see continued increase in some of the input costs. If you look at what copper has done, what aluminum is doing, we see some increases there. We would expect to realize, call it low single-digit price increases in the Americas resi for that reason.

184. During Carrier's earnings call on December 4, 2025, David Gitlin, Chairman and CEO, made it clear that it viewed its prioritization of margin over market share as an example for competitors to follow: "And we believe, as market leaders, that we -- it's important for us to retain pricing discipline, and you should expect that out of us as we go into next year."

185. December 2025 saw a number of additional parallel price increase announcements. Effective December 31, 2025, Bosch increased the prices of its heat pumps. Also effective December 31, 2025, Bosch's Coleman brand increased HVAC Equipment prices by 6–8%. Bosch's Evcon brand also implemented a 3% price increase, effective December 31, 2025.

### 7.    2026: Conspiratorial Pricing Discipline Entrenched as Industry Norm

186. Effective on the first day of the new year, Lennox increased prices of commercial HVAC Equipment by up to 5%.

187. During Trane's January 29, 2026 earnings call, Chris Kuhn, the company's Executive Vice President and CFO, revealed that Trane "reduced factory production days by one-third" in order "to normalize residential inventory." He later explained that prices had not decreased because of decisions by Trane and its competitors to keep supply short of demand: "[W]e've not seen pricing fade in the business. If I think about the fourth quarter, and pricing, it really is more due to volume being lower than anything else." Kuhn also assured Trane's competitors that it would not decrease prices, explaining, "I don't want anyone to think that pricing is coming down in that market." In a competitive market, cutting production by 1/3 would cede market share to rivals. But this conspiracy allowed Trane to act without that risk, confident competitors would likewise restrict its supply and maintain elevated pricing.

188. ACHR News reported on January 30, 2026 that Lennox CEO "[Alok] Maskara reinforced that pricing discipline remains consistent across the industry." In the article, Maskara affirmed Lennox's commitment to price increases that his company observed from its competitors, saying, "Based on everything we have seen so far, we see our competitors aiming at similar price increases."

189. Effective February 16, 2026, Lennox increased prices of residential HVAC Equipment by up to 10%.

190.   Defendants' executives publicly discussed their very recent price increases while attending Barclays 43rd Annual Industrial Select Conference held from February 17–19, 2026, in Miami, Florida. During a presentation on February 17, in response to a question about price competition in the residential business segment, Lennox CFO Michael Quenzer responded to a question about price competition in the residential business segment by again commending the industry for its pricing discipline, and explaining that the industry learned its lesson when it comes to competing on price:

> But if you look at the replacement side, overall, the industry's generally been disciplined for the past several years. We've had cost inputs coming into our business. Others have as well, and we're gonna continue to increase our pricing to maintain our margins. I think others have generally been as well. You know, we, as an industry, have realized that, you know, pricing, you know, taking it away, does not win market share.

191.   By praising the industry's "discipline" and stating that "pricing, you know, taking it away, does not win market share," Quenzer  acknowledged that Lennox and its competitors would not compete for market share by, for example, lowering prices,  which is behavior inconsistent with a competitive market. That same understanding underlies   Carrier's CEO, David Gitlin's confidence that Carrier could maintain price without losing market share. In a February 2026 earnings call, Gitlin declared, "We have no intent of losing any share while

maintaining price." During a February 2026 briefing, Daikin President, Koichi Takahashi echoed the point, stating, "We are not increasing our market share by lowering our selling prices."

192. Quenzer also announced that Lennox would follow Trane's lead in reducing production to manage supply, stating, "So what we've been trying to do is very disciplined, kind of reduce our inventory levels … . So what we're gonna do is reduce some production in the first quarter, keep our inventories flat."

193. Trane's executive presented at the conference that same day. Chris Kuehn, Trane's CFO, echoed the sentiment of Lennox's CFO, Michael Quenzer, announcing, "On price, the team announced a price increase just in the last 10 days. It's up to 5%, effective April 1, and so our plans are to make sure we continue to capture price to offset inflation and still get a spread on that." And he explained that the company's price increase was possible because "the industry has been very disciplined in that regard over many years." When asked, in the context of the industry as a whole, if "people are behaving themselves on the whole on price," Kuehn replied that "we don't see pricing going backwards."

194. Two days later, Carrier's Chairman and CEO, David Gitlin, followed the lead of his company's competitors and announced an identical 5% increase at the conference: "If you look at our residential businesses in terms of realization rates,

58

it's probably best as you go from west to east. In the Americas, we have 5% price that we've announced comes into place next month."

195.   On March 2, 2026, Daikin raised light commercial and commercial HVAC Equipment prices by up to 7% and increased other HVAC Equipment prices by 3.5–5%. That same day, Daikin's Amana and Goodman brands both also separately announced price increases of up to 7%. Effective March 16, 2026, Allied Air (Lennox) matched Daikin's 7% increase. And finally, that same month, Carrier announced its intention to increase its HVAC Equipment prices in the Americas by the "mid-single digit[s]" in 2026.

196.   Effective May 22, RUUD, a Rheem Manufacturing Company, plans to implement a price increase of up to 8%.

## H.   Defendants Elevated HVAC Equipment Prices Above Competitive Levels

197.   Throughout the conspiracy, Defendants touted rising and record profit margins. For instance, in mid-2024, Morningstar resumed its coverage of Lennox and observed that the company's margins rose "from about 8% during the last sales peak in 2007 to nearly 18% in 2023." Similarly, Carrier experienced significant profit increases of around 20% from 2020 to 2021 and 2023 to 2024, which correspond closely to their price increase announcements.

198. In its 2025 Q1 Financial Report, Daikin highlighted how its "[o]perating [p]rofits achieved a new record high" despite inflation and high mortgage interest rates in the Americas.

199. During its earnings call on January 29, 2026, Trane boasted about its profit growth from 2020 to 2025, highlighting that its revenue nearly doubled from approximately $12 billion to $21 billion (representing a compound annual growth rate of approximately 11%), that its adjusted earnings per share grew at a compound annual growth rate of approximately 24% over the same period, and that the company's adjusted Earnings Before Interest, taxes, Depreciation, and Amortization ("EBITDA") margin expanded by 470 basis points to reach 20% in 2025 (as shown in Figure 3 below).

**Figure 3**



60

200.   AAON similarly experienced substantial profit growth in the wake of multiple price increases and a monthly 1% price increase beginning in June 2022. In a May 4, 2023 press release, AAON reported that their "[g]ross profit margin in the quarter increased to 29.0%, up 380 basis points from the comparable quarter in 2022," and that their "[p]rice increases implemented over the last year combined with moderating cost inflation were the driving factors to the gross profit margin expansion."

201.   Defendants' successful scheme is further reflected in the HVAC PPI, which is published by the U.S. Bureau of Labor Statistics and made available on the Federal Reserve Economic Data database maintained by the Research Division of the Federal Reserve Bank of St. Louis. The index shows a marked rise that begins in 2020 and is more abrupt and significant than any other increase in the index over at least the past 22 years (as shown below in Figure 4 below).

**Figure 4**



61

202. As previously discussed, the economic impact of the COVID-19 pandemic alone does not explain the sharp increase in the HVAC PPI because neither the Household Appliance PPI nor the CPI rose nearly as dramatically. Instead, the Household Appliance PPI returned to the CPI while the HVAC PPI remained elevated (as shown in Figure 5 below).

**Figure 5**

I. **"Plus Factors" Support the Plausibility of Defendants' Conspiracy**

203. "Plus factors are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." William E. Kovacic, Robert C. Marshall, Leslie M. Marx & Halbert L. White, Plus Factors and Agreement in Antitrust Law, 110 MICH. L. REV. 393, 393 (2011), available at https://repository.law.umich.edu/mlr/vol110/iss3/1. As discussed below, plus factors support the plausibility of Defendants' conspiracy.

### 1. There are no close substitutes for HVAC Equipment.

204. According to the U.S. Census Bureau's Survey of Construction, 95.4% of new single-family homes started in 2020 in the U.S. had central air conditioning, while the U.S. Energy Information Administration's 2020 Residential Energy Consumption Survey indicates that two-thirds of all U.S. homes have central air conditioning. Based on data collected by the U.S. Energy Information Administration for its 2020 Residential Energy Consumption Survey, over 73% of homes have central heating.

205. HVAC Equipment is equally prevalent in commercial buildings. A 2023 article by the U.S. Energy Information Administration states that 83% of commercial buildings had space heating in 2018, while 78% of commercial buildings had space cooling.

206. HVAC Equipment is vitally important to comfort and maintaining indoor air quality, and, in many parts of the country, it is crucial to remaining safe during periods of extreme winter cold or sweltering summer heat.

207. There are no significant substitutes for HVAC Equipment. As Lennox's CFO, Michael Quenzer, explicitly recognized, "It's not like there's a great substitute for HVAC unless people don't want to have heating and air conditioning."

### 2.      The demand for HVAC Equipment is inelastic.

208.   Price elasticity refers to the sensitivity of the quantity of a good demanded by a purchaser to changes in its price. If demand is elastic, a price increase causes demand for the good to decrease significantly. Conversely, if demand is inelastic, a price increase will have little or no effect on demand. Goods with reasonable substitutes have demand that is elastic. Goods that do not have reasonable substitutes have demand that is inelastic. An example of a good with inelastic demand is gas; commuters and the trucking and airline industries will continue to purchase the gasoline they need regardless of price. Demand for electricity is also inelastic since it is necessary for things like lighting, heating, cooling, and refrigeration.

209.   Inelastic demand facilitates cartel formation and success. When demand is inelastic, cartel members can raise prices above competitive levels without losing significant sales because consumers lack reasonable substitutes and the drop in quantity demanded is smaller than the increase in price.

210.   Demand for HVAC Equipment is inelastic. When HVAC Equipment fails, owners rarely defer replacement equipment, even at elevated prices, given the essential role HVAC Equipment plays in temperature control, comfort, indoor air quality, and safety—particularly during extreme seasons.

211. HVAC Equipment industry leaders even admit the industry's inelasticity. Trane CFO, Chris Kuehn, has publicly stated that when consumers experience multiple rounds of price increases within a year-and-a-half, the industry does not see demand destruction. Similarly, when reflecting on price increases, Carrier CEO has stated, "fortunately, we're in markets where we sell essential products … when your air conditioner breaks, when it's really hot outside, you're going to replace it. So, I think we've seen an ability to increase price and retain it . . . ."

### 3. The HVAC Equipment industry is highly concentrated and consolidated.

212. A concentrated market is more susceptible to collusion. It is easier for competitors to enter into an anticompetitive agreement and sustain it when a small number of firms control a sizable portion of the market. At the same time, this makes it difficult for smaller firms outside a conspiracy to undermine its potency. The U.S. Department of Justice recognizes the following: "Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories. Collusion may also occur when the number of firms is fairly large, but there is a small group of major sellers and the rest are 'fringe' sellers who control only a small fraction of the market." A high degree of concentration and a small number of conspirators also

65

reduce concerns over cartel instability or cheating. For these reasons, market concentration is a plus factor in evaluating the plausibility of an antitrust conspiracy.

213.   Here, the HVAC Equipment industry is highly concentrated, which benefits the formation and maintenance of a conspiracy. Seven companies dominate the market, owning dozens of brands of HVAC Equipment—giving purchasers the illusion of choice—and accounting for a collective market share of over 90% during the Class Period, as shown in Figure 2.

214.   Another measure of market concentration is the Herfindahl-Hirschman Index ("HHI").[3] The U.S. Department of Justice and Federal Trade Commission use the HHI when evaluating whether a merger substantially lessens competition. In a perfectly competitive market, the HHI approaches zero. In a market controlled by a single firm, the HHI reaches its maximum of 10,000 points. The U.S. Department of Justice and Federal Trade Commission consider a market with a score between 1,000 and 1,800 points to be moderately concentrated, while the agencies consider a market where the HHI exceeds 1,800 points to be highly concentrated. In 2020, just the first year of Defendants' price fixing conspiracy,  the HHI score for HVAC Equipment already was over 1,588.

215.   The HVAC Equipment market has also experienced consolidation, further increasing concentration and reducing competition. For example, in April

---

[3] https://www.justice.gov/atr/herfindahl-hirschman-index.

66

2023, Carrier announced the acquisition of heat pump manufacturer Viessmann Climate Solutions, which it completed in January 2024. In October 2024, Rheem Manufacturing completed its acquisition of Nortek Global HVAC, bringing the Frigidaire, Maytag, Miller, Broan, Gibson, Intertherm, and Partner's Choice brand lines under the Rheem umbrella. In August 2025, Bosch acquired Johnson Controls' residential and light commercial HVAC business for $8.1 billion, the largest acquisition in Bosch's history.

### 4.     The HVAC Equipment industry has high barriers to entry.

216.   Barriers to entry are obstacles that prevent new competitors from entering a market easily. They include steep startup costs, often in the form of capital expenditures to build manufacturing facilities, high research and development costs, patents, government regulations, acquiring and training a workforce, and overcoming brand loyalty or established brand names.

217.   A market like the one that exists for HVAC Equipment would ordinarily attract new entrants seeking its high profits. High barriers to entry, however, deter entry and protect and benefit entrenched participants, making collusion easier for existing market participants by reducing the risk that new, non-participating competitors will disrupt the scheme.

218.   The HVAC Equipment industry has significant barriers to entry. It costs hundreds of millions of dollars and takes multiple years to construct a new

manufacturing facility and bring it online. A new plant also means hiring and training thousands of workers to operate, maintain, and oversee the facility. For example, Daikin broke ground on the Daikin Texas Technology Park in 2015, which cost $417 million to build, took more than two years to complete, and employs approximately 5,000 people.

219.   In addition to the capital expenditure necessary to open a new plant, new entrants also have to overcome brand loyalty and strong name recognition of established brands, several of which like Lennox, Carrier, Trane, Rheem, and York and have histories of over 100 years.

### 5.    HVAC Equipment is largely commoditized.

220.   Economics defines a commodity as a basic good used in commerce that is interchangeable with other goods of the same type. When a product is characterized as a commodity, market participants primarily compete based on price. It is easier to implement and monitor an anticompetitive agreement when competition occurs primarily on price because price is objectively measurable and readily observable, unlike non-price factors.

221.   In the United States, the technology and processes for manufacturing HVAC Equipment are well established, as is the technology for the equipment itself. As a result, there is limited HVAC Equipment product differentiation. In fact, a residential furnace manufactured by one Defendant is designed to replace

another manufactured by a different Defendant. The same is true for heat pumps and air conditioning condensers.

222.   Furnaces come in standard cabinet widths, have ratings measured in British Thermal Units per hour ("BTUh") to quantify the heating capacity (e.g., 60,000 BTUh, 70,000 BTUh, and 80,000 BTUh), and have standardized Annual Fuel Utilization Efficiency ("AFUE") ratings expressed as a percentage (e.g., 80%, 90%, and 95%).

223.   Heat pumps also have ratings measured in BTUh to quantify the heating capacity (e.g., 60,000 BTUh, 70,000 BTUh, and 80,000 BTUh), have Heating Seasonal Performance Factor 2 ("HSPF2"), have ratings to indicate energy efficiency for heating (e.g., 7.5 HSPF2, 9.5 HSPF2, and 10.5 HSPF2), have ratings measured in BTUh to quantify the cooling capacity (e.g., 24,000 BTUh, 36,000 BTUh, and 48,000 BTUh), and have SEER2 ratings to indicate energy efficiency for cooling (e.g., 13 SEER2, 16 SEER2, and 19 SEER2). A heat pump with a given heating and cooling capacity will have a similar footprint to a heat pump with the same heating and cooling capacity produced by a different manufacturer.

224.   Air conditioning condensers likewise have similar footprints based on cooling capacity, have ratings measured in BTUh to quantify the cooling capacity (e.g., 24,000 BTUh, 36,000 BTUh, and 48,000 BTUh), and have SEER2 ratings to indicate energy efficiency (e.g., 13 SEER2, 16 SEER2, and 19 SEER2). An air

conditioning condenser with a given cooling capacity will have a similar footprint to an air conditioning condenser with the same cooling capacity produced by a different manufacturer.

### 6. Defendants took advantage of opportunities to collude.

225. Defendants' high-ranking executives had frequent and regular opportunities to meet and collude, including through their membership in trade organizations.

#### a. The Air-Conditioning, Heating, and Refrigeration Institute.

226. The Air-Conditioning, Heating, and Refrigeration Institute ("AHRI") is the primary U.S. trade association for HVAC Equipment manufacturers. Trane, Lennox, Carrier, Rheem, Daikin, AAON, and Bosch are members of AHRI. AHRI hosts several events each year, including what it refers to as four premiere events.

227. Defendants' senior executives currently hold and have held leadership roles on the AHRI Board of Directors during the Class Period.

228. In 2026, Mike Branson (President of Global Air Division, Rheem) and Holly Paeper (President of Commercial HVAC, Trane) serve as Chairman and Vice Chairman, respectively, while David Budzinski (Deputy CEO and President Americas, Bosch), Alok Maskara (CEO, Lennox), Gaurang Pandya (President of Climate Solutions Americas, Carrier), and Yogi Uemura (President, Daikin) serve on the Board.

229. In 2025, Mike Branson (President of Global Air Division, Rheem) served as Vice Chairman, while David Budzinski (President and CEO of Global Residential and Light Commercial, Johnson Controls), Gaurang Pandya (President of Climate Solutions Americas, Carrier), Holly Paeper (President of Commercial HVAC, Trane), and Yogi Uemura (President, Daikin) served on the Board.

230. In 2024, Gary Bedard (Executive Vice President and President of Residential, Lennox) served as Chairman, while Mike Branson (President of Global Air Division, Rheem), David Budzinski (President and CEO of Global Residential and Light Commercial, Johnson Controls), Donny Simmons (Group President of the Americas, Trane), and Yogi Uemura (President, Daikin) served on the Board.

231. In 2023, Chris Nelson (President of HVAC, Carrier) served as Vice Chairman, while Gary Bedard (Executive Vice President and President of Residential, Lennox), Mike Branson (President of Global Air Division, Rheem), Doug Schuster (President of Global Air Distribution, Johnson Controls), Donny Simmons (Group President of the Americas, Trane), Yogi Uemura (President, Daikin), and Philip Windham (President and CEO, Nortek Global HVAC, now part of Rheem) served on the Board.

232. From January 31 through February 2, 2022, executives from Carrier, Trane, LG, Daikin, Rheem, and Mitsubishi were all present at the AHRI Expo in Las Vegas, Nevada. Later, from March 28–30, 2022, executives from Carrier, Goodman

71

Manufacturing (Daikin), Johnson Controls, and Rheem all met at the ACCA Annual Conference and Expo in St. Louis, Missouri. At the ACCA conference, while Casey Yates (Johnson Controls), Mike Branson (Rheem) and Justin Keppy (Carrier) participated in a HVAC manufacturers' panel discussion.

233. From February 2–6, 2023, the AHRI Expo was held in Atlanta, Georgia. In attendance were executives from Daikin, Johnson Controls, and Rheem. From April 2–5, 2023, executives from Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem attended the ACCA Annual Conference and Expo in New Orleans, Louisiana. At this conference, Braden Cook (Carrier), Nathan Walker (Daikin), Brandon Franks (Johnson Controls), and Randy Roberts (Rheem) participated in a panel discussion about the state of the HVAC industry.

234. The AHRI Expo for 2024 was held in Chicago, Illinois on January from 22–24 and was attended by executives from Carrier, LG, Mitsubishi, and Rheem. The ACCA Annual Conference and Expo followed on March 11–14 in Orlando, Florida, and was attended by Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem. During this conference Chris Forth (JCI), Braden Cook (Carrier), John Schneider (Copeland), Doug Widenmann (Daikin), Randy Roberts (Rheem/Ruud), and Heather Buchicchio (Mitsubishi) all participated in a panel discussion about the current state of the HVAC industry.

235. The AHRI Expo was held on February 10–12, 2025, in Orlando, Florida, and was attended by executives from Daikin, Johnson Controls, LG, Mitsubishi, and Rheem. On March 23–27, 2025, in Austin, Texas, executives from Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem attended the ACCA Annual Conference and Expo.

**b.     Other industry conferences.**

236. Other opportunities to collude existed outside of trade organizations. One such example was the 13th Annual Morgan Stanley Laguna Conference, which took place from September 10–12, 2025, and was attended by senior executives from Carrier, Trane, and Lennox. At this conference, Carrier's Senior Vice President and CFO brushed aside the concept of price competition, Lennox's CFO commended the industry's price discipline and discussed his company's forthcoming price increases, and Trane's CEO talked about the company's efforts to reduce supply, consistent with Lennox's call for discipline.

237. Defendants' executives were also present and spoke at the Barclays 43rd Annual Industrial Select Conference held from February 17–19, 2026 in Miami, Florida. It was there that Lennox's CFO spoke of the industry's discipline and mentioned price increases, while Trane's CFO announced a 5% price increase— which Carrier's CEO publicly matched two days later.

73

c.      **ACHR News.**

238.   As noted above, ACHR News is billed as the "the weekly newsmagazine of the HVACR contractor covering residential and commercial contracting." Defendants used ACHR News to signal to one another and perpetuate the conspiracy and communicate their adherence to it. Defendants extensively and nearly exclusively relied on ACHR News to immediately publish and disseminate their price increase announcements throughout the Class Period.

d.      **Heating, Air-Conditioning, and Refrigeration Distributors International.**

239.   Heating, Air-conditioning, and Refrigeration Distributors International ("HARDI") is another organization through which Defendants had numerous opportunities to collude. HARDI bills itself as the leading professional trade association for HVACR wholesale distributors, manufacturers, and representatives that "serves its members through government affairs and advocacy efforts, **market intelligence and benchmarking**, training programs, and world class events." (Emphasis added).

240.   While ostensibly set up to support HVAC distributors, it is clear that HARDI provided the Defendant-manufacturers with further opportunities to collude. For example, at the 2025 HARDI Annual Conference, a "Supplier Town Hall" was held, "dedicated to Supplier Manufacturers!" At that same Annual Conference, a roundtable discussion was held for "Manufacturer Reps Only." That roundtable

74

discussion was described as follows: "Exclusively for manufacturer representative members, these roundtable sessions offer an engaging space to exchange ideas, share experiences, and refine your professional skills. Guided by the Manufacturer Rep Council, each table-led discussion is designed to provide practical insights, foster collaboration, and help you strengthen your expertise."

241. During the Class Period, the HARDI annual conference, which takes place early each December featured speakers from Defendants (such as from Trane and Bosch at the 2025 HARDI conference) and was also sponsored by at least certain Defendants (such as Bosch, Daikin, and Rheem).

## VI.   DEFENDANTS FRAUDULENTLY CONCEALED THE CONSPIRACY, AND PREVENTED ITS DISCOVERY

242. Plaintiff and members of the Class did not have actual or constructive knowledge of their claims because of Defendants' affirmative acts to fraudulently conceal their conspiracy. Defendants' means of effectuating the conspiracy, including, but not limited to, price signaling, information sharing, production signaling, and in-person meetings show that Defendants actively sought to prevent Plaintiff and members of the Class from discovering the conspiracy. So, Plaintiff and members of the Class lacked information that would have placed them on inquiry notice of the existence of an agreement to raise HVAC Equipment prices above competitive levels. Accordingly, Plaintiff and members of the Class did not

discover and, through the exercise of reasonable diligence, could not have discovered, the alleged conspiracy until shortly before this filing.

243. Defendants used terms like "discipline" and "price realization," and spoke of maintaining margins as a priority over competing for market share to hide the conspiracy's existence and accomplish the conspiracy's goals—while also providing reassurance to co-conspirators of their continued commitment to the anticompetitive agreement. Examples of Defendants' use of coded language to conceal the conspiracy and maintain the information flow among co-conspirators include Lennox's CEO, Alok Maskara, stating that "industry pricing remains disciplined," Lennox's CFO, Michael Quenzer, stating that "the industry's generally been disciplined for the past several years [and] we're gonna continue to increase our pricing to maintain our margins" because lowering prices and sacrificing margins "does not win market share," Carrier's Chairman and CEO, David Gitlin, stating that "we believe, as market leaders, that we -- it's important for us to retain pricing discipline, and you should expect that out of us as we go into next year," Johnson Controls' Chairman and CEO, George Oliver, crediting the "further expanding [of] our margin profile," in part, on the company's "disciplined pricing approach," and Daikin's talk of avoiding "falling into price wars with our competitors."

76

244.   Not only did Defendants take affirmative steps to keep their agreement secret and conduct the activities of the conspiracy in private, but they also gave alternative, non-conspiratorial explanations for HVAC Equipment price increases. These pretextual explanations were always public and intended to mislead Plaintiff and members of the Class and divert attention away from the conspiracy.

245.   Like in most industries, Defendants initially said supply chain disruptions following the onset of the COVID-19 pandemic in March 2020 were responsible for price increases on HVAC Equipment during the Class Period. Defendants' price increases due to COVID-19 pandemic were often couched as price adjustments due to rises in "inflationary costs" and "cost inflation." Beginning in 2025, Defendants shifted the blame to tariffs. For example, Rheem's Senior VP and General Manager was reported as saying that "tariffs and overall economic conditions have increased the cost of raw materials."

246.   Defendants also blamed two federal initiatives for price increases on HVAC Equipment during the Class Period: the updated SEER2 energy efficiency standards and the phasedown of HFCs under the AIM Act.

247.   On January 6, 2017, the U.S. Department of Energy published the direct final rule establishing the new SEER2 energy conservation standards in the Federal Register, which set minimum efficiency requirements for new HVAC Equipment

77

sold beginning on January 1, 2023.[4] Defendants therefore had at least six years to develop HVAC Equipment that complied with the SEER2 standards. Regardless, Defendants still blamed the new SEER2 standards for equipment price increases. For example, on its website for HVAC professionals, Lennox claimed, "The new air conditioners will be approximately 10–15% more than [outgoing models]. The new heat pumps will be approximately 20–25% more than [outgoing models]. This price increase is due to a more efficient compressor, a more efficient fan motor, a larger coil and cabinet size, and a higher refrigerant charge to achieve the higher efficiency."

248. Under the AIM Act, which was enacted on December 27, 2020, the U.S. Environmental Protection Agency required a phase-out of the R-410A refrigerant, prohibiting the manufacture and import of air conditioning condensers and heat pumps that use R-410A beginning on January 1, 2025.[5] On its website that catered toward residential customers, Lennox pinned HVAC Equipment price increases on the refrigerant transition.

249. Yet, it was the HVAC Equipment industry that spearheaded efforts to transition away from HFC refrigerants like R-410A by investing billions of dollars

---

[4] https://www.federalregister.gov/documents/2017/01/06/2016-29992/energy-conservation-program-energy-conservation-standards-for-residential-central-air-conditioners.

[5] https://www.epa.gov/climate-hfcs-reduction/frequent-questions-phasedown-hydrofluorocarbons.

78

and more than a decade advocating for a transition away from HFCs. In fact, they claimed they had "invested the most and [were] the best prepared" for the transition, as shown by the 2019 congressional testimony of Stephen Yurek, President and CEO of AHRI:

> More than 15 years ago, the U.S. HVACR industry began investing billions of dollars in R&D to be the first to bring to market next generation refrigerant technologies. More than a decade ago, the U.S. HVACR industry began working with the George W. Bush Administration to initiate discussions under the Montreal Protocol for a global phase down of HFCs. After nearly a decade of advocacy by the U.S. HVACR industry, these discussions culminated in the Kigali Amendment to the Montreal Protocol in 2016. The Kigali Amendment intensified the global competition over next generation refrigerant technologies in the fast-growing international HVACR market. American-based companies have invested the most and are the best prepared to benefit from a global transition out of HFCs and into American-made next generation refrigerant technologies.

250. Plaintiff and members of the Class had no ability to determine the accuracy of these pretextual explanations for price increases that Defendants communicated to the public.

251. In the days immediately following a lawsuit filed on March 20, 2026, alleging that Defendants were engaged in a price-fixing conspiracy, the shares of the publicly-traded Defendants—Lennox, Carrier, Trane, and Johnson Controls—all fell sharply. That the market reacted to the price-fixing lawsuit by selling off stock

of the Defendant companies is evidence that Defendants were concealing the conspiracy even from investors.

252. Defendants' fraudulent concealment tolls the applicable statutes of limitations on the claims of Plaintiff and the Class. It also acts to equitably estop Defendants from asserting any statute of limitations defense.

## VII.   CLASS ACTION ALLEGATIONS

253. Plaintiff brings this action on behalf of itself and as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), seeking treble damages, injunctive relief, and other relief pursuant to federal antitrust laws on behalf of members of the following class:

> All entities and persons who purchased HVAC Equipment directly from any of the Defendants or any of their co-conspirators in the United States and its territories at any time from January 1, 2020, until the present (the "Class Period").

254. Specifically excluded from the Class are (1) Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant, (2) any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, any business majority-owned by any such person, (3) any Co-Conspirator identified in this Action, and (4) any federal governmental entities.

255.   The Class is so numerous as to make joinder impracticable. Plaintiff does not know the exact number of Class members, but the above-defined Class is readily identifiable and is one for which records should exist. Plaintiff believes that due to the nature of the HVAC Equipment industry there are at least thousands of members of the Class in the United States.

256.   Common questions of law and fact exist as to all members of the Class. Plaintiff and the Class were injured by the same unlawful price-fixing conspiracy, and Defendants' anticompetitive conduct was generally applicable to all the members of the Class. Relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

a)   Whether Defendants engaged in a conspiracy to artificially inflate, increase, and stabilize HVAC Equipment prices;

b)   The identity of the participants in the conspiracy;

c)   The duration of the conspiracy and the acts performed by Defendants in furtherance of the conspiracy;

d)   Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiff and other members of the Class;

e)   The effect of Defendants' conspiracy on the price of HVAC

81

Equipment sold in the United States during the Class Period; and

f)     The amount of class-wide damages.

257. These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

258. Plaintiff's claims are typical of the claims of members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated, increased, and stabilized prices of HVAC Equipment sold in the United States, resulting from price-fixing in the HVAC Equipment industry by Defendants.

259. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

260. Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

261. As described herein, Defendants acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

262. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

263. Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VIII.  ANTITRUST INJURY

264.  Defendants' anticompetitive conduct had the following effects, among others:

a)  Price competition has been restrained or eliminated with respect to HVAC Equipment;

b)  HVAC Equipment prices have been fixed, raised, stabilized, or maintained at artificially inflated levels;

c)  Plaintiff and the Class have been deprived of free and open competition; and

d)  Plaintiff and the Class paid artificially inflated HVAC Equipment prices.

265.  Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive price paid by Plaintiff and the members of the Class. Thus, the economic harm to Plaintiff and the members of the Class can be quantified.

266.  The purpose of the collusive conduct of Defendants is to raise, fix, stabilize, or maintain the price of HVAC Equipment and, as a direct and foreseeable result, Plaintiff and the members of the Class paid supra-competitive HVAC Equipment prices during the Class Period.

267. By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher HVAC Equipment prices than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, have suffered damages.

268. This is an antitrust injury of the type that federal and state antitrust laws were meant to punish and prevent.

## IX.   CLAIMS FOR RELIEF

### COUNT 1: VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1) FOR RESTRAINT OF TRADE

269. Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

270. Beginning on or around January 1, 2020, the exact date being unknown to Plaintiff and the Class and exclusively within the knowledge of Defendants, and continuing through the present, Defendants entered into a continuing agreement to unlawfully and unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating price competition for HVAC Equipment.

271. In particular, Defendants have combined and conspired to raise, fix, maintain, or stabilize the price of HVAC Equipment sold to United Sates purchasers during the Class Period.

272.   As a result of Defendants' unlawful and unreasonable conduct and acts taken in furtherance of their conspiracy, the price of HVAC Equipment sold to purchasers in the United States during the Class Period was raised, fixed, maintained, or stabilized at artificially inflated levels.

273.   The combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action between and among Defendants.

274.   For purposes of formulating and effectuating their combination or conspiracy, Defendants did those things they combined or conspired to do, including:

a)   Participating in meetings and conversations at regular industry events and meetings;

b)   Communicating in writing and orally to raise, fix, maintain, and stabilize price of HVAC Equipment;

c)   Agreeing to coordinate and manipulate the price of HVAC Equipment sold to United States purchasers in a manner that deprived those purchasers of free and open price competition;

d)   Issuing or signaling to each other price announcements and price quotations for HVAC Equipment in

accordance with the agreement Defendants reached among themselves;

e)     Selling HVAC Equipment to United States purchasers at non-competitive and artificial prices that Defendants collusively determined; and

f)      Providing pretextual justifications to purchasers and the public to explain any rises, maintenance, or stabilization of the prices for the Defendants' HVAC Equipment.

275.   As a result of Defendants' anticompetitive conduct, Plaintiff and the Class have been injured in their business and property in that they have paid more for HVAC Equipment they purchased during the Class Period than they otherwise would have paid but for Defendants' conduct.

276.   Plaintiff and the Class are entitled to damages, treble damages, and an injunction against Defendants, preventing and restraining the violations alleged herein, and equitable relief.

## X.     PRAYER FOR RELIEF

277.   WHEREFORE, Plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully requests that:

A.     The Court determine that this action may be maintained as

87

a class action under Fed. R. Civ. P. 23(a), b(2), and (b)(3), appoint Plaintiff as Class Representative and the law firm of Saveri Law Firm as Lead Class Counsel, and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Class, once certified;

B.      The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants be adjudged to have been a per se violation (or alternatively illegal as a quick look or full-fledged rule of reason violation);

C.      The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law,

88

together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

        E.      The Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## XI.    JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

*[SIGNATURES NEXT PAGE]*

Dated:  May 19, 2026

Respectfully Submitted,

MILLER COHEN, PLC

By:  */Richard G. Mack, Jr.*
  Richard G. Mack Jr.

Richard G. Mack Jr. (P58657)
Jeff DeLaunay (P87821)
MILLER COHEN, PLC
*Justice For Working People*
7700 Second Avenue, Suite 335
Detroit, MI 48202
Telephone:  (313) 566-4787
Facsimile:   (313) 964-4490
Email:   richardmack@millercohen.com
   jdelaunay@millercohen.com

Joseph R. Saveri
Cadio Zirpoli
Ronnie Spiegel*
Ivy Arai Tabbara*
Drew M. Morgan
SAVERI LAW FIRM, LLP
550 California Street, Suite 910
San Francisco, California 94104
Telephone:  (415) 500-6800
Facsimile:   (415) 395-9940
Email:   jsaveri@saverilawfirm.com
   czirpoli@saverilawfirm.com
   rspiegel@saverilawfirm.com
   itabbara@saverilawfirm.com
   dmorgan@saverilawfirm.com

Anthony J. O'Neill
MICHAEL'S & MELO, P.C.
53 W. Jackson Blvd., Suite 1115
Chicago, IL 60604
Telephone: (312) 588-5000
Facsimile: (312) 427-5709
Email:   aoneill@michaelsmelo.com

Michael R. Pieczonka
PIECZONKA LAW LLC
617 Devon Avenue
Park Ridge, IL 60068
Telephone: (847) 502-8404
Facsimile: (847) 825-7746
Email:   m@pieczonkalaw.com


Benjamin J. Widlanski
KOZYAK, TROPIN & THROCKMORTON
2525 Ponce de Leon Boulevard, Floor 9
Miami, FL 33134
Telephone:   (305) 372-1800
Facsimile:   (305) 372-3508
Email:   bwidlanski@kttlaw.com

Adam Zapala
Elizabeth T. Castillo
Christopher Jeu
Christian Ruano
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road
Burlingame, CA 94010
Telephone:   (650) 697-6000
Facsimile:    (650) 697-0577
Email:   azapala@cpmlegal.com
          ecastillo@cpmlegal.com
          cjeu@cpmlegal.com
          cruano@cpmlegal.com

*Counsel for Plaintiff Daniel's Heating &
Cooling Co.*
* Located in Washington State

91